James MIXON, (H. B. Edwards, Jr., as Temporary Administrator upon the estate of James Mixon substituted as party-appellant for James Mixon, deceased), Appellant,

v.

ATLANTIC COAST LINE RAILROAD COMPANY, Appellee.

No. 22965.

United States Court of Appeals Fifth Circuit.

Dec. 30, 1966.

J. Lundie Smith, Valdosta, Ga., for appellant.

Roy M. Lilly, T. Heyward Vann, Thomasville, Ga., Cam U. Young, Valdosta, Ga., Alexander, Vann & Lilly, Thomasville, Ga., Young, Young & Ellerbee, Valdosta, Ga., of counsel, for appellee.

Before TUTTLE, Chief Judge, BROWN and GODBOLD, Circuit Judges.

GODBOLD, Circuit Judge.

Appellant James Mixon[1] sued the appellee, Atlantic Coast Line Railroad Company (ACL) in negligence for loss of two legs and an arm suffered when he was struck by a boxcar being pushed by a switch engine. ACL moved for a directed verdict at the conclusion of Mixon's case, stating grounds therefor; the Court carried the motion with the case. When both sides had rested ACL renewed its motion and made a separate motion for directed verdict on the same grounds but as of the closing of the evidence.

The case was submitted to the jury, which returned a verdict for Mixon of $81,532.80. The District Court then granted the motion for directed verdict made as of the closing of the plaintiff's evidence, and alternatively granted ACL's motion for judgment n. o. v. ACL had filed an alternative motion for new trial, which the Court considered and denied as provided by Rule 50(c).

Mixon appeals from the granting of the motions for directed verdict and judgment n. o. v. ACL specifies as cross-error denial of the alternative motion for new trial.

The District Court filed an opinion which sets out that the railroad's motions were granted on alternative theories: that Mixon's own negligence was the sole proximate cause of his injury; that his negligence was equal to or greater than that of the railroad, which under the Georgia rule of comparative negligence barred him from recovery; and that plaintiff had assumed the risk.

The correctness of the Court's conclusion as to the directed verdict depends on the state of the evidence at the close of plaintiff's case, as to the judgment n. o. v. on all the evidence.

We conclude the trial court erred in granting the motions for directed verdict and judgment n. o. v.

*1. The Facts.*

Following is evidence which had been introduced prior to conclusion of plaintiff's case and which the jury was authorized to believe regardless of any contradictory evidence later submitted by defendant.

Mixon was injured on ACL's spur track ("industrial service track") located in the business district of Valdosta, Georgia. Exhibit 1 to this opinion is a map of the pertinent area. The accident occurred approximately 20 to 25 feet east of the NW corner of the "brick and tin warehouse" (24B3) located in Block 24.

---

1. Appellant died pending this appeal, and his administrator has been substituted.

Appellant was age 45 when the accident occurred on May 2, 1962. He had lived at the corner of Savannah Avenue and Lee Street (OORI on map) since about 1948. From about 2:30 p. m. to about 6:00 p. m. he was in Elton's Bar at the corner of Crane Avenue and Ashley Street. He went home, ate supper and returned to the bar about 7:00 p. m. He left there about 9:00 p. m., went into the vacant lot (24U2) and relieved himself, walked west along Crane Avenue, then north on Patterson Street to the Downtown Cafe (NW corner of 25B5) where he stayed briefly and had a cup of coffee. He had one small draft beer during the afternoon, two cans of beer after supper, and was not intoxicated.

Leaving the cafe he walked east along the industrial service track to Ashley Street, and crossing it continued east along the south side of the track. There were alternative ways plaintiff could have reached home. Lighted sidewalks were available from the area of the bar, and the cafe, and from where he crossed Ashley Street; to go by sidewalk was about 150 feet further than to go home along the track. But plaintiff chose the track this night. He knew he was traversing the track and that it was not an alley or street. It was fair weather, and he was wearing his glasses. As he walked along he was looking ahead. The route was slightly upgrade. He did not walk between the rails but to the south of them and as close to the adjacent buildings as he could get.

The spur track was used solely to spot cars at the various business houses located along it. From where it came off Savannah Avenue it extended approximately five blocks west to a dead end. From plaintiff's evidence it appeared railroad use of the track was neither at regular times nor with great frequency. Men with businesses at the east and west ends of Block 25 parked their automobiles on the track at will; if a train came the crew would dismount and request any automobile on the track be moved, or move it themselves. In Block 24 a roofing supply business (building 24B1) regularly parked its trucks across the tracks to load and unload at its dock. In Block 25 the alley running north and south was used by trucks which turned east and ran along the tracks to Ashley Street. In Block 24 the short alley (24U1) led to the warehouse alongside which plaintiff was struck, and was in use. The track was weedy, littered with debris, trash and bottles and in the immediate area of the accident there were weeds "as high as your leg," and boxes, trash and rubbish 1½ to 2 feet high on the track.

In addition to the uses already set out the track was used by pedestrians. A substantial part of such usage was in Block 24. Witness Goff, whose place of business was on the west side of Ashley Street and facing east (25B3), frequently saw pedestrians walking the right of way east of Ashley Street, and this usage had been about the same all the 13 years his place of business had been there. For a period of three months a waitress who lived on Lee Street (north of the portion shown on the map) and worked at Elton's Bar (24B4) would, when she walked to work, enter the spur at Savannah Avenue and follow it east to Ashley. She had observed pedestrians walking back and forth through the area, and there were well-worn paths through the area. For 11 years witness Faglie, who worked in the back of building 24B1, saw pedestrians going across and back and forth in the area of the tracks behind the building. In Block 24 there was a path down the middle of the tracks— some witnesses put it at the place where plaintiff was hurt, others from the short alley (24U1) northeast to Savannah Avenue. There were other paths across the tracks. Sober people walked along the track of Block 24, drunks walked along it at times, and the police looking for drunks at times. Plaintiff himself had walked along it "a whole lot of times" coming home, sometimes at night, and had seen several people a day walking along the spur in Block 24.

There is other evidence of pedestrian usage and paths in Block 25, which we need not set out in detail.

As the plaintiff walked east the train came west, one boxcar pushed by a switch engine with the front end of the engine against the boxcar. The plaintiff never saw any light—he saw none on the boxcar, and could not see the engine light because of the intervening boxcar. He saw no lookout in front of the boxcar nor anyone on the boxcar. The area of the accident was unlighted and was dark.

When plaintiff was at or near the northwest corner of the warehouse (24B3) he heard the train for the first time. In some of his testimony plaintiff stated he heard only the noise of its running, not whistles or bells; elsewhere he mentioned running noise *and* bells ringing; the difference is not of great significance, since his testimony is that he heard nothing until a second before he and the train came together.

When he heard the train noise he was aware there was a train in the vicinity but thought it was on the main line track, which was north of where he was and ran east and west along Savannah Avenue. From the map it appears he was about 150 feet from the main line, with buildings intervening between it and his location. Either he did not see the train at all, or if he saw it at all before it came in contact with him it was only a second before, and it was "all over [him]," or "right up on [him]." Between the time he became aware there was a train somewhere in the vicinity and the time he was struck, he walked a few steps. He attempted to get out of the way of the train and either it hit him or he fell. In the area where plaintiff was struck the clearance between a grab iron on the side of a boxcar and warehouse 24B3 is only 16¾ inches.

No one on the train saw or was aware of plaintiff at this time. The train proceeded westward along the track to its destination in another block, the crew spotted the boxcar, and on the eastward return trip of the engine alone the crew found Mixon. Police were called immediately and found his body about two feet from the track, six to eight feet west of the warehouse corner, lying in weeds. They found blood on the track as far east as 20 to 25 feet east of the warehouse corner. One of Mixon's feet was severed and between the rails, an arm and the other leg were almost severed.

## 2. The Motion for Directed Verdict.

■ In considering the motion for directed verdict the Court was bound to view the evidence most favorably to plaintiff, giving to plaintiff every reasonable inference to be deduced therefrom, and unless the Court could properly determine that no reasonable man could reach a verdict in favor of plaintiff he was bound to submit the case to the jury. Turner v. Atlantic Coast Line R. R. Co., 292 F.2d 586 (5th Cir., 1961); Herron v. Maryland Casualty Co., 347 F.2d 357 (5th Cir., 1965). Applying this standard to the evidence at the close of plaintiff's case, the jury could have concluded ACL had a duty of ordinary care to plaintiff.

■ In his direct case plaintiff put on no evidence of ownership of the spur track. After defendant's case commenced there was evidence by both sides as to whether ACL had a mere permissive right of user or some greater interest in, or right to use of, the spur track. This question we need not decide, for assuming that at the close of plaintiff's case, by a presumption of ownership, plaintiff was shown to have been injured on a track of which ACL was the owner this did not take the case from the jury.[2] Under Georgia law, whether plaintiff was a trespasser or licensee, the railroad was bound to use ordinary care and diligence in approaching and traversing places where there was reason for it to anticipate that persons might be on the track; in such situation the general rule, that the railroad owes a trespasser a duty of

---

2. In his opinion the trial judge acknowledged there "probably" was a jury question whether plaintiff was or not a trespasser.

ordinary care only after discovery of him in a place of peril, does not apply. Crawford v. Southern Ry. Co., 106 Ga. 870, 33 S.E. 826 (1899); Williams v. Southern Ry. Co., 11 Ga.App. 305, 75 S.E. 572 (1912); Southern Ry. Co. v. Campbell, 309 F.2d 569 (5th Cir., 1963).

■ The scope and extent of the railroad's duty must be in terms of the surrounding circumstances, including the prior usage which imposed the duty in the first place. Shaw v. Georgia R. R., 127 Ga. 8, 55 S.E. 960 (1906). Thus where a duty is imposed solely by such usage at a single point as would give the railroad reason to anticipate that someone might be on the track, the duty may extend only to persons actually on or in the immediate vicinity of the path. See Western & Atlantic R. Co. v. Michael, 175 Ga. 1, 165 S.E. 37 (1932). In a densely settled urban area the character of public use, and other circumstances, may be such that the duty is not confined in a geographical sense to a single and exact point. In Williams v. Southern Ry. Co., 11 Ga.App. 305, 75 S.E. 572 (1912) the Court stated:

> "Without regard to the question whether the person killed or injured in the particular case was or was not a trespasser or a bare licensee upon the track of the railway company, the company is bound to exercise special care and watchfulness at any point upon its track, where people may be expected upon the track in considerable numbers, as, for example, in a city where the population is dense, even between streets where the track has been extensively used for a long time by pedestrians, *or where the roadbed is constantly used by pedestrians.*"

Accord: Southern Ry. Co. v. Chatman, 124 Ga. 1026, 53 S.E. 692, 6 L.R.A.,N.S., 283 (1906); Crawford v. Southern Ry. Co., supra. The duty of due care will have different scope and extent in populous urban areas than in rural places.

Crawford v. Southern Ry. Co., supra. In Georgia the guiding principles are the same whether the custom is to cross the track or walk longitudinally along it. Shaw v. Georgia R. R., supra; Williams v. Southern Ry. Co., supra.

■ Considering the location of the track in a town business district, the nature of the area and the prior usage which we have described in detail, it was not required, as a matter of law, that plaintiff show long and habitual use of a point 20 feet east of the NW corner of the warehouse and in a limited area in immediate proximity to that point. The single path cases do not govern the present facts.

■ Whether the character of and the length of prior use, and the other circumstances as well, were such as to impose on the railroad a duty to anticipate the presence of possible trespassers was for the jury. Williams v. Southern Ry. Co., supra; Shaw v. Georgia R. R., supra.

■ There was adequate evidence by plaintiff from which the jury could conclude the railway had breached a duty of ordinary care to plaintiff by proceeding through an unlighted and dark industrial and warehouse area at night and at a place where there were only 16¾ inches of clearance for a person on the south side of the track, with no light on the head end of its direction of movement, without blowing its whistle or ringing the bell or otherwise warning persons who might be on the track, with no lookout on the head end, and with insufficient observation by the crew of the track ahead.

■ The trial court concluded that Georgia Code Annotated § 105–603 [3] barred plaintiff from recovery. "This duty [imposed by § 105–603] on the part of the plaintiff to exercise ordinary care to avoid the consequences of the defend-

---

3. *"Diligence of plaintiff.*—If the plaintiff by ordinary care could have avoided the consequences to himself caused by the defendant's negligence, he is not entitled to recover. In other cases the defendant is not relieved, although the plaintiff may in some way have contributed to the injury sustained."

ant's negligence necessarily applies to a situation where there is opportunity to avoid the consequences and does not arise until the negligence of the defendant becomes apparent, or the circumstances are such that an ordinary, prudent person would apprehend its existence." Stanaland v. Atlantic Coast Line R. Co., 192 F.2d 432 (5th Cir., 1951), citing Western & A. R. Co. v. Ferguson, 113 Ga. 708, 39 S.E. 306, 54 L.R.A. 802 (1901).

In like fashion the Court barred plaintiff under the Georgia rule of comparative negligence, that if the negligence of plaintiff equalled or exceeded that of defendant there can be no recovery. Georgia Railway & Power Co. v. Belote, 20 Ga.App. 454, 93 S.E. 62 (1917); Southern Ry. Co. v. Campbell, supra.

All these are jury matters.

"In Georgia it is well recognized that questions of diligence and negligence, including comparative negligence and proximate cause, are peculiarly for the determination of the jury, and will not be determined by the courts as a matter of law except in palpably clear, plain and undisputed cases." Stanaland v. Atlantic Coast Line R. Co., supra, citing numerous Georgia cases. This is not a "palpably clear, plain and undisputed case." Giving consideration to the evidence of the facts existent that night and previously, which we have set out above, and the inferences therefrom in favor of plaintiff, it cannot be said that a reasonable man on the jury was required to reach a verdict that plaintiff, solely by being on the track at the time and place where he was, was guilty of such disregard for his own safety as barred him from recovery. And whether a reasonable person would have apprehended breaches of duty by defendant (which breaches the jury was authorized to find), and whether defendant after he became aware of the train "right on [him]" took proper action to avoid accident, were matters for the jury, as was the question whether negligence, if any, of defendant proximately caused or

contributed to plaintiff's injury, and the issue of the quantum of plaintiff's negligence, if any.[4]

■ ACL contends there must be shown to be knowledge by the operating crew of this particular train of the use out of which the duty of care arose. Where there is evidence of habitual or common use the jury may infer knowledge by the operator in the absence of categorical denial by him. Atlantic Coast Line Railroad Company v. Futch, 263 F.2d 701 (5th Cir., 1959). Such an inference was possible at the conclusion of plaintiff's case. At the conclusion of defendant's case it was unnecessary since the members of the crew acknowledged acquaintance with some of the usages we have described.

We conclude the Court erred in granting the directed verdict.

*3. The Motion for Judgment n. o. v.*

The evidence presented in defendant's case, viewed most favorably to plaintiff as the standard requires, made even clearer plaintiff's right to have the case submitted to the jury. Defendant's evidence disclosed that the track was used by the railroad only three to four times a week. A police captain with 25 years on the force testified to pedestrian use of the right of way, and as to Block 25 to use by vehicles driving on it. Members of the train crew acknowledged that in Block 25 cars were parked on the track at times and removed by the crew at times, and that there was pedestrian use of the track.

As to lights and lookout, the crew testified the switchman was riding the head end of the boxcar carrying a signal lantern, which was the only light at the head end. The engineer was proceeding solely by lantern signals from the switchman. The boxcar cut off the light from the engine, and that light had no effect insofar as showing the way for the train. There was no lighted visibility ahead of the boxcar originating from any lights on the train. In the area of the point of

---

4. See further discussion below, under judgment n. o. v., of this point.

impact the switchman was riding the southwest corner (left front) of the box-car, and when the clearance narrowed to 16¾ inches in order to clear he had to place his body at the corner of the car, resting partly on the side grab irons and partly around the front of the car, and he could not give any more signals until he cleared the end of the building.

The switchman testified that from the street lights on Ashley Street he could have seen the outline of figures on the track or an object on the track, but saw nothing as the train moved west; that if plaintiff had been walking or lying on the track or beside the track he would seen him, but did not see him; that any-one riding the boxcar should have felt the jar from running over a man's legs. Plaintiff had to be wholly or partly on the track to suffer his injuries, and it is undisputed that the train inflicted them and that it did so on its westward move. From this testimony the jury could con-clude that the switchman was not keep-ing a lookout (or was not even where he said he was) and not attentive to what was occurring.

The Court also held plaintiff barred from recovery by assumption of risk.[5] The Court held that assumption of risk overlapped the "avoidance" rule of § 105–603 and is sometimes applied in the name of contributory negligence. The Georgia cases phrase this in terms of vol-untarily and knowingly taking a risk of obvious and imminent danger which in itself amounts to failure to exercise due care for one's own safety. Bryant v. Pittman, 101 Ga.App. 842, 115 S.E.2d 418 (1960); Southern Railway Co. v. Hogan, 131 Ga. 157, 62 S.E. 64 (1908). We have already pointed out that pres-ence alone of plaintiff on this particular track at night is not as a matter of law such disregard for his safety as to bar his recovery, although, of course, it is such evidence that the jury might con-clude him barred. The trial court stated that when plaintiff reached the corner of the warehouse and was standing in an open space he heard a train and then in a situation of obvious danger· made a de-liberate choice and proceeded into a dark and cluttered alleyway when it was a short distance by another route to a well-lighted paved street. This overlooks the evidence that the track was seldom and irregularly used, that plaintiff thought the noise came from a train on the main line approximately 150 feet away, that his position at that instant was not clearly located as still being in the open space, that the train was "right on [him]" a second after he heard it, and that he did attempt to avoid it but fell (or was hit).

This is not a clear, palpable and undisputed case authorizing taking from the jury its role of determining issues of fact relating to diligence, negligence and causation. The court erred in granting the motion for judgment n. o. v. Craig Funeral Home, Inc. v. State Farm, etc. Ins. Co., 280 F.2d 337, 340 (5th Cir., 1960).

### 4. The Motion for New Trial.

ACL sought a new trial be-cause of an allegedly erroneous charge based on § 94–507 of the Georgia Code.[6] The denial of a new trial is specified as

---

5. Its opinion asserted this only as a ground for granting the judgment n. o. v., but the result in this Court would be the same had assumption of risk been a ground for granting the motion for directed verdict also.

6. "Within the corporate limits of cities, towns and villages [a] * * * railroad company shall not be required either to erect * * * blowposts * * * or to blow the whistle of its locomotives in approaching the crossings or public roads in corporate limits, but in lieu there-of the engineer of each locomotive shall be required to signal the approach of his train to such crossing in said cor-porate limits by constantly tolling the bell of said locomotive. * * * [N]othing in this section * * * shall be held to relieve the said engineer or the said rail-road company of his or its duty of keep-ing and maintaining a constant and vig-ilant lookout along the track ahead of its engine while moving within the corporate limits of said city, own or village, or to excuse such railroad company or such engineer from exercising due care in so

cross-error and may be reviewed by this Court without the necessity of a cross-appeal, under Rule 50(c). The Court read § 94–507 to the jury and charged that violation of it would be negligence per se. ACL insisted it had no application because plaintiff was not within 50 feet of a public crossing. There was evidence that the short alley in Block 24 (24U1) was in use at the time of the accident and that it led to the warehouse (24B3). A witness had measured the distance from the alley to the NW corner of the warehouse as 63 feet; most of the evidence put the point of impact 20 to 25 feet east of the NW corner. It was, then, for the jury to determine whether the alley was a "crossing" of the track and whether plaintiff was within 50 feet of it, and the charge was correct. (No objection was made, or explanatory charge requested, concerning definition of "crossing.")

▬▬▬▬ ACL also asserted as ground for a new trial the charge on last clear chance,[7] to which proper exception was made. The charge was erroneous. Georgia law brings into play the doctrine of last clear chance only when defendant is aware of plaintiff's position, not when by exercise of care plaintiff's position should have been discovered by defendant. Southland Butane Gas Co. v. Blackwell, 211 Ga. 665, 88 S.E.2d 6. The jury could conclude from the evidence that the train crew should have been aware that plaintiff was on or immediately adjacent to the track, and in

failing to become aware did not exercise the proper care and diligence referred to in the charge. It is obvious that under the particular facts here involved the charge was prejudicial error.

\* \* \*

The directed verdict, and judgment n. o. v., for the defendant having been erroneously granted, and the defendant being entitled to the granting of its alternative motion for a new trial, the case is reversed and remanded.

JOHN R. BROWN, Circuit Judge (specially concurring).

I concur fully in the result and in the opinion. I add this special concurrence only to point out the woeful and unfortunate loss of precious judicial time from the necessity of a retrial and perhaps a reappeal of a case which could have been once tried, once appealed, and once affirmed had the trial Court used the simple but flexible and workable procedure of special questions with a general charge under F.R.Civ.P. 49(a). See the numerous cases cited in Weymouth v. Colorado Interstate Gas Co., 5 Cir., 1966, 367 F.2d 84, 93, n. 31. Under the enigma wrapped in a mystery of the general charge and general verdict, we are required to assume that the jury followed only the erroneous instruction and found for Mixon on last clear chance. That is a wild assumption in this record. At any rate, the jury's answers would have revealed whether, as they surely must have done, they found ACL failed to keep "a

---

controlling the movements of such trains as to avoid doing injury to persons or property which may be on such crossings within said city or within 50 feet of said crossing on the line of such railway. \* \* \* "

7. "Likewise, on the other hand, even though the plaintiff may have been guilty of negligence which contributed to this incident and the injuries by putting himself in a position of peril, if, thereafter, the defendant, seeing the position in which he was, if it saw that position, had an opportunity by the exercise of proper care and prudence to save him from the consequences of his negligence it was its definite duty to do so, and if the defend-

ant failed to do so and if that failure was the immediate proximate cause of the injury to the plaintiff he may still recover by reason of what is called the last clear chance doctrine, which is the same doctrine I have just charged you as applicable the other way. It applies both ways.

"In other words, under the doctrine of the last clear chance the law imposes a duty upon all persons to exercise ordinary care to avoid the consequences of negligence of another where the negligence of such other is existing and is either apparent *or the circumstances are such that by the exercise of proper care and diligence it should have become apparent.*"

proper lookout", failed to sound proper bell signals, or the like. This would have made the error in last clear chance inconsequential.

Urged as we are to employ judicial inventiveness as judicial administration collides with an ever expanding population and economy,[1] it is unfortunate that too many judges and too many lawyers merely from a lack of personal experience with something other than the non-revealing general charge and verdict fail to use or experiment with this marvelous tool.

1. See the Annual Address of the Chief Justice to the American Law Institute in May 1965, and again May 1966; Bros Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1965, 351 F.2d 208, 209 n. 1.